NEW YORK PRACTICE REPORTS.                    391

Attorney-General agt. Atlantic Mutual Life Insurance Co.

# SUPREME COURT.

In the Matter of the ATTORNEY–GENERAL agt. THE ATLANTIC MUTUAL LIFE INSURANCE COMPANY.

*Life insurance company — insolvency proceedings — when application by company to have its assets taken from receiver and to permit it again to transact business will not be granted — power of special term.*

Where the business of an insurance company had been closed and a receiver thereof appointed, pursuant to the provision of chapter 902 of the Laws of 1869, an application was made to the special term by the company to have its assets taken from the receiver and returned to it and to permit it to again transact business:

*Held*, that the authority of the special term to grant such application is gravely questioned and will not be assumed.

*Nor*, under such circumstances, will a reference be ordered to report the facts to the court, as a reference had already been had under the statute (the actuary being the officer specially charged with such an investigation), and his report having been made which stands confirmed by both the special and general term,

*It seems*, that if the order appointing a receiver had been made because a large sum of money had been lost by a robbery, and after such appointment the money was returned, the court, by virtue of its general power in the administration of justice, might, in that or a similar case, interfere. But the reason or cause for such interference must be extraordinary.

The peculiar facts and circumstances connected with the various proceedings in this case fully discussed in the opinion.

*Albany Special Term, September,* 1878.

APPLICATION by the company to have its assets taken from the receiver and returned to it, and to permit it again to transact business.

*Wm. Barnes*, for motion, &c.

*Francis Kernan*, for sundry policyholders.

*George L. Stedman*, for other policyholders.

*A. Schoonmaker, Jr.*, attorney-general, for people.

*S. Rosendale*, for superintendent of insurance.

*Henry Smith*, for receiver.

WESTBROOK, *J.* — The Atlantic Mutual Life Insurance Company was a corporation doing business under chapter 902 of the Laws of 1869. It has been, in virtue of the provisions of that act, enjoined from doing any new business, and a receiver has also been appointed of its assets, which injunction and receiver order it now seeks to vacate, to the end that it may resume its functions. A history of past events is necessary to the proper understanding and discussion of the questions which this application presents.

On the 8th day of May, 1877, the superintendent of insurance reported to the attorney-general, in pursuance of section 7 of the law referred to, that, in his opinion, the affairs of the company were in such a condition "as to render the issuing of additional policies and annuity bonds by said company injurious to the public interest." In addition to this general statement the superintendent in his report gave the amount of its liabilities and of its assets and made the excess of the former, as to its policyholders, over the latter $110,385.

Upon this report the attorney-general acted, as he was required by law to do (*section 7 of chapter 902, Laws of 1869*), and on the 11th day of May, 1877, obtained an order for the company to show cause, on the fourteenth day of the same month, why "an order should not be granted that the

business of said insurance company be closed and a receiver thereof be appointed." It may be proper to state here that the action of the court is also made compulsory by the same section of the statute, and its duty to enjoin its continuance in business and to appoint a receiver is made dependent, not upon the insolvency of the company; but the section expressly provides: " The court shall, thereupon, proceed to hear the allegations and proofs of the respective parties, and in case it shall appear to the satisfaction of the said court that the assets and funds of said company are not sufficient to justify the further continuance of the business of insuring lives, granting annuities and incurring new obligations as authorized by its charter, then the said court shall issue an order enjoining and restraining said company from the further prosecution of its business, and shall also appoint a receiver of all the assets and credits of said company."

At great personal inconvenience, in order to avoid the delay and costs of a reference, the court itself heard the testimony upon the application of the attorney-general. The evidence showed that $118,000 of its assets had been deposited with a private banker who was unable to pay it, a sum $8,000 in excess of its capital stock. There were grave doubts as to some of its investments upon bond and mortgage, and a dividend had been paid in January, 1877, to stockholders, of seven per cent in gold, when, very clearly, none should have been declared. The examination was not so thorough as it would have been if the court had been required to find the company insolvent before it had power to appoint a receiver. It was, however, sufficiently full to enable the court to say, as it did say, that whilst it did not regard the company actually bankrupt, it was clear that, in the then sensitive condition of the public mind, with a sum greater than its capital, either actually lost or then unavailable, with some of its securities questioned and the distrust created by the report of the superintendent of insurance and the action of the attorney-general, the business of the company could not, with a just

regard to the public interest, be any longer continued unless its stockholders paid into the treasury of the company the sum of $50,000 in cash.   The announcement of this conclusion was favorably received by all parties as an inspection of the stenographer's record of the examination will show.   By way of reminder a small part of what then occurred is here inserted:  " Mr. Barnes — 'I wish the court would fix some time in which this matter will have to be finished.'   The Court — ' Well, what time will suit you?'   Mr. Pruyn — 'I can have $30,000 within twenty-four hours; I don't want time for that purpose, but in order that a meeting of the stockholders may be called.'   Mr. Rosendale — 'I hope they will do it as sharp and as promptly as possible.'   The Court — ' Can you do it by the last Tuesday in this month?'   Mr. Pruyn — 'Easily.'   Mr. Rosendale — 'I was in hopes they would do it in far less time; I think a week is a long time.'   Mr. Pruyn — 'I shall have to consult the other stockholders; Mr. Alfred Van Santvoord and Mr. Lansing were here yesterday and I had $25,000 ready, but it will take a few days to see the other stockholders.'   The Court — 'Do you say, Mr. Pruyn, that you have no doubt but that this arrangement will be completed?'   Mr. Pruyn — 'Not the least, your honor, because I have seen the largest number of the stockholders and they are prepared to do it and desire to do it.'   The Court — ' Then the proceedings will now stand adjourned until the last Tuesday of this month, and the suit will then be dismissed provided the claim against the Hope Banking Company be further reduced by the payment of $50,000 in cash; evidence of that fact to be presented to the court.' "

This conclusion was reached and concurred in early in June. On the last Tuesday of June the proceedings were adjourned to the Ulster special term, at Kingston, held on the 21st day of July, 1877.   On the latter-mentioned day, the company appeared, and instead of the amount of capital required being made up, it stated by its counsel, that not a dollar thereof had

been paid in. It then also appeared with a divided board of direction, a portion of whom desired the appointment of a receiver, and though confessing its inability to comply with the order of the court as to its capital, it asked that it might continue its business, promising to assume no new obligations until by its natural gains its losses should be made up. As there was no power in the court to allow it to continue in a state of semi-life, and as by the destruction of the confidence of its policyholders, they would prefer to allow their policies to lapse rather than to risk the payment of further premiums, the court, both for want of power and in justice to the policyholders, whom it did not propose should suffer for the benefit of stockholders, refused the application, enjoined the company's business, and appointed Edward Newcomb the receiver thereof.

From the order of the special term arresting its business and appointing a receiver, the company appealed to the general term of this court. The appeal brought before that tribunal all the evidence and proceedings of the special term, and was there most carefully and elaborately argued. The action of the special term was fully·sustained, and in the opinion then delivered by Mr. justice BOARDMAN, in which his associates, judges LEARNED and BOOKES concur, after reciting the conclusion of the special term, it said : "Such has been the finding and decision in this matter, and we think there is sufficient, *not only to sustain, but to demand such a result.* Indeed, it was substantially conceded by the defendant's officers upon the hearing, and an effort made to supply the necessary amount of assets to enable the company to go on with its business."

Not content with the conclusion of the general term of this court the company appealed to the court of appeals. That court also unanimously affirmed the judgment. of the special term. Judge FOLGER, in announcing the conclusion of the court of dernier resort, says : " It is not to be denied that the proof discloses a laxness of administration. The

trustees were not in the practice of regular or formal meetings, nor, as a body, did they keep up a vigilant, regular or casual supervision of its affairs. A large share of its assets was kept as a cash deposit with a private banker without an agreement from him to pay interest, with no security from him against loss, and he an officer of the company, chiefly instrumental in the conduct of its affairs. Without a regular vote or meeting of the board of trustees, dividends were paid to the stockholders, when, according to the testimony of the secretary, it was impossible to know whether or not the capital of the company was impaired, and when there had, in fact, been losses and depreciation in the value of its assets. * * * A consideration of the facts and circumstances of this case leads us to the conclusion that the exercise of a sound discretion will not authorize a reversal of the action of the courts below." * * *

It will thus be seen that the action of this court at special term, reluctantly taken, after giving the stockholders of the corporation ample time and opportunity to avoid the result, has been confirmed by all the courts, but the history is not yet complete. In November, 1877, the company, by one Lemon Thomson, who is described in the petition as " one of the trustees thereof," and who in the verification attached thereto swears, "I am duly authorized by a vote of the majority of the stockholders representing a majority of all of the stock of said company to make the foregoing petition, and verify the same on its behalf," asked the district court of the United States for the northern district of New York to administer its assets in bankruptcy. The petition stated among other things, " that said company owes debts exceeding the amount of $300, *and is unable to pay all of the same in full.* That said company is willing to surrender all its estate and effects for the benefit of its creditors, and desires to obtain the benefit of the act entitled 'An act to establish a uniform system of bankruptcy throughout the United States,' approved March 2d, 1867, and the several acts of congress

amendatory and supplementary thereto." In the verification annexed to the petition Mr. Thomson, in addition to what has been hereinbefore mentioned as therein contained, also declares : " *I do hereby make further oath that the statements contained in said petition are true, according to the best of my knowledge, information and belief.*"

Perhaps, the recital of the past events connected with this company up to this point needs no comment. It may not be a waste of words, however, briefly to state that whilst the corporation was endeavoring to reverse an order which simply declared it to be in an unsafe condition to do business, and whilst by appeals and arguments it was complaining of the injustice of being placed in the hands of a receiver, it was itself, by a proceeding in a federal court, declaring, under oath, that it was actually insolvent, and asking that court to administer and distribute its assets among its creditors through an officer whose functions are identical with those of a receiver, though in that court he is called an assignee.

After the proceedings instituted in the bankrupt court had been dismissed the company sought legislative aid to take its assets from the hands of the receiver, and to restore to its own management the control of its affairs. Upon a full and careful hearing and investigation, the law-making body refused to interfere, and the company was left in the state that the decision of the courts had placed it, under and by virtue of existing laws. From these facts it is apparent that the legislative department of the state government is in full accord with the judicial as to the propriety of past action.

Let us now resume the history of the proceedings in this court. After his appointment as receiver, Mr. Newcomb, with the approval of the superintendent of insurance, and as is required by section 8 of the act of 1869, appointed Mr Charles R. Knowles, actuary, for the purpose of making " a careful investigation according to the standard fixed by the laws of this state, into the condition of said company, and report thereon in writing, under oath, to said court and receiver."

The actuary, Mr. Knowles, made a careful, minute and thorough examination of the affairs of said company, and embodied the result in an elaborate report. By that report the company was found to be insolvent, as to its policyholders, to the extent of $40,564.57, and insolvent as to stockholders to the amount of $150,564.57.

When this report was presented to this court, on the 11th day of March, 1878, an order was made, as such report was most strenuously objected to as erroneous, sending it back to the actuary "for revision and correction, if he shall find any errors therein, and after such revision and correction of any errors therein, if any exist, that said actuary signify his conclusions by a supplementary report to the court, and thereafter counsel may be heard further upon the case as then presented, upon a notice of three days."

The actuary, pursuant to the order of the court, on full notice to all parties interested, did, after hearing them fully, revise and correct his report, and by a supplemental report, having found an error in the original of $733, made the deficiency as to policyholders, $39,831.57, and as to stockholders, $149,831.57.

On the presentation of this report to the court at special term, it was held that the statute required and contemplated no action by the court. That as the report of the actuary was unfavorable to the solvency of the company, the statute ( sec. 8 of chap. 902 of Laws of 1869 ) expressly required the receiver to notify the superintendent of insurance, who with the state treasurer and receiver, was required to convert the assets into money and pay them over to the receiver, who was then to pay creditors as the section directs. The reasons for that conclusion were embodied in an opinion, to which reference is now made.

From the order of the special term requiring the receiver to proceed as the statute directs, an appeal was taken to the general term of this court, and the order of the special term was there affirmed. In the opinion of the general term per

BOARDMAN, J., after discussing the question of net and gross valuation, it is said : " Whatever rule may have been adopted in calculating these values, *it is evident the condition of the company's affairs is not such as would justify a continuance of its business in any form.* The greatest profit to all concerned consists in the prompt winding up of its affairs, and giving to all creditors their just proportion of its assets."

From the statement which has been given of the past proceedings in regard to this company, it will be seen that the application to return it again to its assets and life is made, after the superintendent of insurance has pronounced it insolvent on a careful examination, after this court, with the confirmation of the general term and of the court of appeals, has pronounced it unsafe to the public interests to allow it to continue its business, after the legislature has refused the relief now sought, after the actuary has found it insolvent, after the explicit declaration of the general term upon the actuary's report and the order of this court thereon, that " it is evident the condition of the company's affairs is not such as would justify a continuance of its business in any form," and after the company itself, acting at the instance of a majority of its shareholders and of its capital, has applied to the federal court in bankruptcy to be wound up as a bankrupt corporation, *its petition to that court being verified by the same individual,* who verifies that to this court, in which latter one it is stated that the company is not only solvent but in an excellent condition to do business. Granting the general power of this court claimed for it by the parties favorable to this motion, would it not be a most extraordinary thing for this court now to reverse all past action and start the company anew ? If any extraordinary reason or cause existed, perhaps such a thing might be done. If, for example, as counsel argued upon the motion, the order appointing a receiver had been made because a large sum of money had been lost by a robbery, and after such appointment the money was returned, the court, by virtue of its general power in the

administration of justice, might, in that, or a similar case, interfere. But when the law has pointed out the mode of ascertaining a corporation's situation as to solvency and that course has been pursued, and the answer is against the solvency, when this court, neither at general or special term, has detected any error in the calculation or conclusion, has this court power, by a new investigation and new inquiry, to again investigate its affairs in regard to the identical matter and things already completely passed upon? If it has, then the command of the statute requiring action, after it has been ascertained and declared insolvent in the mode it prescribes, conveys only idle words, and the legislative mandate is impotent to govern courts. The point now is, not whether the court may not send the report back to the actuary for revision, that power has been once exercised by the special term, and its exercise approved by the general term, nor does it involve the right of the court to act upon new facts occurring after past action, but it is this: Has the special term the power, when the actuary has declared the company insolvent, when his conclusion has been approved by the general term, and when the statute commands action, to go over the same ground the actuary has traveled, and undo and dismiss all past proceedings? The existence of that authority is gravely questioned, and will not be assumed.

It is, however, strenuously urged that a reference should be ordered, to report the facts to the court. We have already seen that a reference has been had under the statute (for the actuary is the officer specially charged with such an investigation), and a report has been made, which stands confirmed by both the special and general term. Grant the power to order the one now asked for, should it be made? That investigation, if directed must continue several weeks, if not months, and must cost several thousand dollars. What evidence is there before the court to justify this expenditure? Only, and solely the oath of Mr. Lemon Thomson, who, while he tells this court, on oath, " that the said company is now in a con-

dition to meet all of its outstanding liabilities, even upon a net valuation, and also including its outstanding stock as a portion of the said liabilities;" also, on oath as previously stated, told another court less than a year before, that it was "unable to pay all of the same" (its debts), "in full," and that a majority of its stockholders, representing a majority of its stock, desired it to be wound up as an insolvent corporation, according to the provisions of the bankrupt act. This extraordinary change of condition, since the former oath, and since all past action, is accounted for by an alleged error in the actuary's report, which neither the special or general term saw, and by the alleged failure of holders of policies to die. In regard to the latter thought, it may be observed that it is quite likely the death rate among policyholders for a short period has been less than usual, as it, in an equally short period in the future, may be greater. No rate of premiums or calculations of life insurance companies are based upon the mortality of a single year, but upon the average of human life. The gain of one year is overcome by the loss of another, so far as gain or loss depends upon life or death ; and it would be most unsafe and unsound in principle to adopt the gain of a single year, caused by unexpected continuances of life, as a basis for pronouncing an insolvent company solvent. As time elapses that gain must be overcome, or the average length of a number of lives, found by experience to be true, is at fault. The court, then, can see no reason upon the testimony before it, either to grant the petition, or to justify it in incurring the large outlay which a reference would involve. The resources of the company should be carefully husbanded, and expended only upon clear evidence requiring it, and that has not been given.

There is also one other thought which has great weight with me in reaching the conclusion to deny this application. This motion is in the interest of stockholders only and not of policyholders. If the corporation is restored to its functions, the premiums which are past due must be paid up, and poli-

cies continued in life by the payment of those to accrue. What policyholder will feel safe in so doing? Will not all suffer them to lapse, and will not the court, in granting this motion, only wipe out debts without payment, and give back to debtors assets which ought to liquidate obligations incurred? It is true a time in the future could be fixed for policyholders to pay premiums in arrear, but how few would be able to make the payments, and how few, with confidence destroyed, willing. It would indeed be a capital money-making arrangement for stockholders, but to policyholders what? The situation can only be explained by strong language. It would be life to the former, but death to the latter. From the responsibility of such action this court must be excused.